USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-31-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RAFAEL RODRIGUEZ,                                       :
                                                        :
                              Plaintiff,                :          **OPINION AND ORDER**
                                                        :
               - against -                              :
                                                        :          **15-CV-2570 (RLE)**
CAROLYN W. COLVIN,                                      :
**Acting Commissioner of Social Security,**            :
                                                        :
                              Defendant.                :

**RONALD L. ELLIS, United States Magistrate Judge:**

## I.      INTRODUCTION

Plaintiff Rafael Rodriguez commenced this action under the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security

(the "Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").  On November 30, 2015, Rodriguez moved for judgment

on the pleadings, asking the Court to reverse the Commissioner's denial, and remand for a

calculation of benefits. In the alternative, Rodriguez asks for a remand for further administrative

proceedings with assignment to a different ALJ and with time limits imposed on the remand

proceedings. Pl.'s Mem. in Support of his Mot. for J. on the Pleadings at 1.  The Commissioner

filed a cross-motion for remand, asking the Court to remand the case for further administrative

proceedings. Def.'s Mem. of Law in Support of the Commissioner's Cross Motion for Remand

and in Opp'n to Pl.'s Mot. for J. on the Pleadings at 1.  For the reasons set forth below, the case

is **REMANDED** for further administrative proceedings. Rodriguez's request for an instruction

for calculation of benefits, and his request for remand to a different ALJ with a time limit on proceedings are both **DENIED**.

## II.    BACKGROUND

### A.    Procedural History

Rafael Rodriguez applied for DIB on June 11, 2010, and for SSI on September 22, 2010, alleging disability that began on February 1, 2009. (Tr. at 282-89). Both claims were denied by the Social Security Administration ("SSA") on January 26, 2011. (*Id.* at 184). Rodriguez submitted a request for a hearing by an Administrative Law Judge ("ALJ") on February 11, 2011. (*Id.* at 196). ALJ Seth Grossman held hearings on December 15, 2011, April 23, 2012, and May 13, 2013. Rodriguez attended the December 2011 hearing with counsel, Karen Tobin. (*Id.* at 136). He attended the April 2012 hearing with a different attorney, Aaron Vega, a vocational expert, Merriam Greene, and a medical expert, Dr. Donald Goldman. (*Id.* at 55). Vega also represented Rodriguez at the May 2013 hearing, attended by a different vocational expert, Jakob Tikes, and a different medical expert, Dr. Malcolm Brahms. (*Id.* at 29). On August 8, 2013, ALJ Grossman issued a decision denying Rodriguez either benefit. (*Id.* at 21). Rodriguez filed a request with the Appeals Council for a review of ALJ Grossman's decision on August 8, 2013. (*Id.* at 7). The request was denied on March 9, 2015. (*Id.* at 1). Rodriguez filed this action on April 3, 2015, and both parties consented on May 7, 2015, to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). (Doc. No. 1, 6).

### B.    Medical Evidence

Rodriguez claims his disability is caused by a number of psychological and physical impairments: anxiety, depression, schizophrenia, right leg and knee pain, left shoulder pain, and complications from past surgeries. (*Id.* at 188, 314). The medical evidence presented to ALJ

Grossman covers the period from August 8, 2006, to April 25, 2013, and individual pieces of evidence often concern multiple impairments. (*See, e.g.,* Tr. at 670-76) (treating physician's report opining on disc herniation, lower back pain, and osteoarthritis in the right knee). ALJ Grossman was thus required to analyze a lengthy and complex record to assess the effects that a number of impairments – both independently and in combination – had on Rodriguez's ability to work. This Opinion and Order presents the medical evidence grouped by impairment.

### 1.     Right Knee Impairment

In 2006, Rodriguez was allegedly assaulted by a co-worker and suffered a contusion to his right knee. (*Id.* at 149, 381). Stephen Kette, a physician's assistant at the Center for Bone and Joint Disease, diagnosed Rodriguez with a ligament sprain and meniscal tear in his right knee. (*Id.* at 403). Rodriguez made subsequent visits to Dr. Richard Katz at the Center, complaining of pain in his knee. Dr. Katz ordered an arthroscopy, and concluded that the meniscal tear might have aggravated some pre-existing problems. He noted that Rodriguez would have to be disciplined about physical therapy to improve his knee condition. (*Id.* at 398-402).

On November 19, 2010, Dr. Dipti Joshi examined Rodriguez for the SSA. Dr. Joshi found some soft tissue swelling around Rodriguez's right knee and extension out to 75 degrees. (*Id.* at 569). Dr. Joshi concluded that Rodriguez had "moderate limitation to walking, climbing, and standing" and "[m]arked limitation to squatting." (*Id.* at 570). On November 30, 2011, Dr. Daniel Sotelo-Garza, one of Rodriguez's treating physicians at All Med Clinic, diagnosed Rodriguez with severe osteoarthritis in his right knee. (*Id.* at 671).

Rodriguez had another orthopedic evaluation on February 2, 2012. Dr. Jose Corvalan noted mild swelling of the right knee and 40 degrees of flexion. He concluded that Rodriguez

was moderately limited in walking long distances, bending, climbing, and standing and sitting for long periods of time because of right knee and back pain. (*Id.* at 759-60).

Rodriguez was also examined by Dr. Henry Sardar,[1] a pain management specialist, on April 11, June 6, and August 8 of 2012. (*Id.* at 967-74). Dr. Sardar noted during each of those visits that Rodriguez had mild effusion, osteoarthritic hypertrophy, and patellar grinding in his right knee. (*Id.*). He ordered an x-ray on February 29, 2012, which documented degenerative change, and an MRI on August 22, 2012, which found a degenerative meniscus tear, mild effusion, and osteoarthritic changes. (*Id.* at 940-41). On September 14, 2012, however, Rodriguez was examined by Dr. Ashok Dubey at All Med Clinic. (*Id.* at 893). Dr. Dubey noted mild swelling in Rodriguez's right knee, but found no misalignment, defects, or muscle atrophy. (*Id.*). Rodriguez was examined again by Dr. Sardar on January 9, 2013. Dr. Sardar's findings were the same as the three prior visits. (*Id.* at 961).

### 2.    Left Shoulder Impairment

During his consultative examination on November 19, 2010, Dr. Joshi noted that Rodriguez had rotator cuff surgery performed on his left shoulder and that he suffered "moderate limitation to reaching" with his left arm. (*Id.* at 570). Forward elevation of the left arm was limited to 100 degrees, abduction to 120 degrees, and external rotation to about 75 degrees. (*Id.* at 569). Dr. Corvalan also found "moderate limitation" on using the left shoulder at his February 2, 2012 consultative examination. (*Id.* at 759). He concluded, however, that Rodriguez should never lift or carry objects even under ten pounds because of his left shoulder pain. (*Id.* at 761).

---

[1] Dr. Sardar was indicted for healthcare fraud on October 1, 2012. His case is still pending. *See* Ex. C, Def.'s Mem. of Law in Support of the Comm'r Cross Motion for Remand and in Opp'n to Pl.'s Mot. for J. on the Pleadings. Two other medical sources in the record, Dr. Herbert Meadow and West 5th Medical Supply, have also been indicted for, or pled guilty to healthcare fraud. *See id.*, Ex. A. These sources are still included as part of the medical record here, as they formed part of the record the ALJ considered, and, in the case of Dr. Meadow, provided evidence the ALJ expressly relied on to make his decision. A discussion of the need to discount this evidence on remand is provided below in Section III. The Commissioner raised this as grounds for remand, however, Rodriguez did not mention it in his brief.

Similarly, Dr. Sardar noted decreased range of motion in forward flexion and abduction in the left[2] shoulder during his examinations on April 11, 2012, June 6, 2012, August 8, 2012, November 7, 2012, December 12, 2012, and January 9, 2013. (*Id.* at 961-72).

### 3. Disc Herniation and Lower Back Pain

Following Rodriguez's 2006 injury, an MRI revealed he had a moderately herniated disc at L4-5. (*Id.* at 404). In September and October 2006, Dr. Craig Bennett recommended physical therapy to treat the pain from the herniation and an apparent lumbar sprain. (*Id.* at 400-05). Rodriguez later received an MRI sometime in 2010 and another on February 7, 2011, both of which showed disc herniation at L4-5. (*Id.* at 530, 946).

On October 22, 2010, Rodriguez visited the Clay Avenue Health Center and was examined by Lucy Palomino, a nurse practitioner, who found "no abnormalities" in his back or spine. (*Id.* at 559). On November 2, 2010, Anthony Mandese, a physician's assistant at All Med Clinic, ordered a disc herniation evaluation for Rodriguez. (*Id.* at 587). On December 29, 2010, Mandese assessed Rodriguez with "lumbar chronic pain syndrome." (*Id.* at 581).

On October 19, 2011, Dr. Danilo Sotelo-Garza evaluated Rodriguez at All Med and found disc herniation and tenderness at L4-5. Dr. Sotelo-Garza also performed a positive straight leg test and determined specific reductions in range of motion. He found that Rodriguez suffered a 10 degree decrease in flexion, a 5 degree decrease in extension, a 25 degree decrease in lateral bending, and a 20 degree decrease in lateral rotation, as measured against the normal range for each of those motions. (*Id.* at 895).

On November 30, 2011, Dr. Sotelo-Garza filled out a "Multiple Impairments Questionnaire" for the SSA and diagnosed Rodriguez with lumbar spine disc herniation, finding

---

[2] On February 1, 2012, Dr. Sardar noted the same limitations in the right shoulder. Given Dr. Sardar's near-identical notes, and his indictment, his notes may not be reliable. (Tr. at 974).

a decreased range of motion with pain and noting that Rodriguez had previously been prescribed a back brace. (*Id.* at 671). Dr. Sotelo-Garza found that the back pain affected Rodriguez's lower extremities. (*Id.* at 672). Rodriguez could sit and stand for only one to two hours a day, and only occasionally lift and carry objects weighing five to ten pounds. (*Id.* at 673-74). Dr. Sotelo-Garza opined that Rodriguez could not sit, stand, or walk continuously in a work setting. (*Id.*). Rodriguez also had "significant limitations in doing repetitive reaching, handling, fingering, or lifting" according to Dr. Sotelo-Garza. (*Id.*). Finally, Dr. Sotelo-Garza noted in the questionnaire that Rodriguez could not push, pull, kneel, bend, or stoop on a sustained basis in a work setting. (*Id.* at 679).

Dr. Sardar noted a decreased range of motion in the lumbar spine with pain at the end range during examinations on February 1, 2012; April 11, 2012; June 6, 2012; August 8, 2012; November 7, 2012; December 12, 2012; and January 9, 2013. (*Id.* at 961-74).

### 4.   Ambulatory Impairments

There is some evidence in the record that suggests Rodriguez may suffer from significant ambulatory impairments.  On November 19, 2010, Dr. Shelia Aspinal performed a psychiatric evaluation of Rodriguez for the SSA.  In her report, she noted that Rodriguez "walked with a cane" and "had a shuffling gait." (*Id.* at 563).

A physical residual functional capacity assessment, completed on January 24, 2011, by "E. Sousa" noted that during the physical examination, Rodriguez "limped when he walked with his cane which he always uses for weightbearing [sic]." (*Id.* at 591).  Rodriguez told Sousa that his doctor prescribed the cane, but Sousa noted "actually the cane was ordered by an RN NP, who reported that [Rodriguez] was ambulating without any difficulty." (*Id.*).  Despite the ambiguity about the cane, Sousa reported that Rodriguez "could not walk on his toes, had

difficulty walking on heels, [and] only squatted 25%." (*Id.*). On February 3, 2011, Anthony Mandese of All Med Clinic prescribed a cane for Rodriguez. (*Id.* at 643). On December 6, 2011, a "rollator" – a kind of walker – was delivered to Rodriguez from West 5th Medical Supply. [3] (*Id.* at 663).

When Rodriguez appeared at his first hearing before ALJ Grossman, on December 15, 2011, Grossman asked about a device Rodriguez had next to him. "This is called my cart [...] [I]t helps me with my disc, so every time I walk, every 15 – every let's say it's two blocks. I'll sit down and I'll relax." (*Id.* at 165). Rodriguez had his cart again at the second ALJ hearing on April 23, 2012. (*Id.* at 61-62).

On February 3, 2012, Dr. Corvalan reported in a medical source statement to the SSA that Rodriguez required a walker to ambulate, and that a cane was "medically necessary" to ambulate. (*Id.* at 762). On February 1, 2012, and on April 11, 2012, Dr. Sardar noted that Rodriguez "has slow gait, difficulties in standing and walking without [an] assistive device." (*Id.* at 972, 974). In contrast, Dr. Ashok Dubey reported that Rodriguez's gait was "coordinated and smooth" in his June 28, 2012 examination. (*Id.* at 893).

Finally, in his July 12, 2012 written interrogatory to ALJ Grossman, Dr. Donald Goldman, a consultative medical expert, indicated some uncertainty whether Rodriguez could ambulate without a cane. In his source statement questionnaire, Dr. Goldman left blank the question "Does the individual require the use of a cane to ambulate? Yes/No," writing beside it "Cane? Brace?" (*Id.* at 779). Dr. Goldman also questioned Rodriguez several times about his use of a back brace, (*Id.* at 85), and his need for a walker, (*Id.* at 96), at the April 2012 hearing, but appeared skeptical that the record firmly showed a walker was medically necessary. (*Id.* at 115-19).

---

[3] West 5th Medical Supply was indicted for healthcare fraud on October 1, 2012. *See supra* Note 1.

### 5.    Bipolar Disorder and Depression

On September 8, 2010, Rodriguez was examined by a FEGS social worker. He reported a history of depression, anxiety, and suicidal ideation. (*Id.* at 526). At the time, he was taking Zoloft, Xanax, Navane, Trazadone, and Dioxeine. (*Id.* at 527). On October 22, 2010, Esther Aguirre at the Clay Avenue Health Center diagnosed Rodriguez as having major depression. (*Id.* at 553-56). She decided to continue his medication regime. (*Id.*)

On November 19, 2010, Dr. Shelia Aspinal evaluated Rodriquez psychiatrically and concluded that, although he had some attention and concentration limitations because of pain, and although his ability to handle stress appeared "compromised," his impairments did "not appear to be significant enough to interfere with [his] ability to function on a daily basis." (*Id.* at 564-65). Rodriguez appeared capable of (1) understanding and following simple instructions, (2) performing simple tasks independently (although he needed assistance because of physical limitations), (3) regularly attending to a routine, and (4) maintaining a schedule. (*Id.* at 564).

In contrast to Dr. Aspinal's assessment, non-examining psychologist Dr. E. Kamin concluded in a residual functional capacity assessment dated January 1, 2011, that Rodriguez had (1) marked limitations in his ability to understand, remember, and carry out detailed instructions, and (2) moderate limitations in his ability to interact appropriately with the general public, accept instruction and criticism from supervisors, and get along with co-workers. (*Id.* at 611). None of his abilities, however, were significantly limited. (*Id.* at 610).

On February 2, 2012, Dr. Herb Meadow completed a psychiatric evaluation of Rodriguez. He found that Rodriguez suffered from depression and a panic disorder, but could perform complex tasks independently, learn new tasks, maintain a schedule, make appropriate decisions, and relate adequately to others. (*Id.* at 750). Rodriguez would, however, have trouble

dealing with stress, and his attention and concentration appeared impaired "due to limited intellectual functioning." (*Id.* at 749-50).

Between November 12, 2010, and September 24, 2013, Rodriguez was treated by Dr. Edward Fruitman and psychiatric staff at All Med Clinic.  On July 6, 2011, Dr. Fruitman completed a psychiatric impairment questionnaire.  He noted that Rodriguez had chronic depression and anxiety.  (*Id.* at 682).  Rodriguez had marked limitations in his ability to remember and carry out detailed instructions, work around others without being distracted, and accept instructions and respond to criticism from supervisors.  (*Id.* at 687-89).  He had moderate limitations in his ability to (1) remember locations and procedures, (2) maintain attention and concentration for extended periods, (3) follow a schedule, (4) sustain a routine without supervision, (5) get along appropriately with the general public and co-workers, and (6) respond appropriately to changes in the workplace.  (*Id.*).  Dr. Fruitman reported that Rodriguez experienced episodes of deterioration or decomposition in work settings.  (*Id.* at 689).  Dr. Fruitman also noted that Rodriguez was taking Zoloft, Seroquel, Xanax, and Alprazolam.  (*Id.*).

In an August 27, 2012 assessment, Dr. Fruitman noted that Rodriguez had depression and bipolar disorder.  (*Id.* at 795).  In a September 24, 2013 medical report to the SSA, Dr. Fruitman wrote that Rodriguez suffered from clinical depression, anxiety, and bipolar disorder.  (*Id.* at 857-58).  He also reported that Rodriguez was unable to perform activities of daily living, and that his pain conditions and COPD exacerbated his depression.  (*Id.* at 870-71).  In contrast to his 2011 psychiatric questionnaire, Dr. Fruitman concluded in his September 2013 report that Rodriguez suffered marked limitations in his ability to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, and act appropriately with the general public and co-workers.  (*Id.* at 872-73).  Rodriguez had extreme limitations in

his ability to understand, remember, and carry out complex instructions, interact appropriately with supervisors, and respond appropriately to changes in a routine work setting. (*Id.*). Dr. Fruitman based his assessment on "patient appointments, statements, and mental status evaluations documenting conditions by others since November 2009." (*Id.* at 873).

### 6.      Manipulative Limitations

In his November 19, 2010 internal medicine examination, Dr. Joshi found that Rodriguez had a full range of motion in his elbows, forearms, and wrists, bilaterally. (*Id.* at 569). However, in a February 3, 2012 medical source statement, Dr. Corvalan stated that Rodriguez could never perform reaching, pushing, or pulling with either his right or left hand, but could only occasionally reach overhead, handle, finger, or feel with either hand. (*Id.* at 763).

Dr. Goldman found that Rodriguez could only occasionally reach and push and pull with his right hand, but that all other manipulative functioning was fully unlimited. (*Id.* at 780). Dr. Brahms found that Rodriguez could occasionally finger and push and pull with his right hand, and that he could frequently handle and feel with it. (*Id.* at 1047). All other functioning, including that of his left hand, was determined to be unimpaired. (*Id.*).

### C.      Hearings before ALJ Grossman

#### 1.      December 15, 2011 Hearing

The first ALJ hearing was held roughly ten months after Rodriguez applied for a hearing. ALJ Grossman, Rodriguez, and his attorney, Karen Tobin, were present. (*Id.* at 138). Rodriguez testified that he was injured in 2006 when he was attacked by a co-worker, and was injured again in 2009 when he suffered a motorcycle accident. According to his attorney, the 2009 incident was the disabling event. (*Id.* at 145). Rodriguez also testified that he was scheduled to have knee replacement surgery in two months to treat an injury caused by the 2006 accident. (*Id.* at

146). Tobin conceded that there was no evidence of the knee replacement surgery in the record. (*Id.*). ALJ Grossman noted that surgery "certainly would be strong evidence if that's true," and advised Rodriguez and his attorney that he would need to see evidence of this surgery (*Id.* at 146-47).

Rodriguez testified that he had been hit in 2009 while riding a motorcycle in Puerto Rico and had been hospitalized there for three months with injuries to his elbow, back, and head, and had rotator cuff surgery performed. (*Id.* at 158-60). Rodriguez also testified that he has suffered from anxiety, depression, and auditory hallucinations since the 2006 attack by his co-worker. (*Id.* at 150). He testified that he suffers from back pain, and has been advised by some of his doctors to undergo some surgical procedure to remedy this. (*Id.* at 168-71). Additionally, Rodriguez testified that he has emphysema and COPD, which also prevents him from working. (*Id.* at 174-76).

After hearing this testimony, ALJ Grossman decided to send Rodriguez for consultative psychiatric and orthopedic examinations. (*Id.* at 176-77). Attorney Karen Tobin asked that any subsequent medical advice the ALJ might need be done at a supplemental hearing. (*Id.* at 178).

### 2.    April 23, 2012 Hearing

On April 23, 2012, ALJ Grossman; Rodriguez; his attorney, Aaron Vega; and vocational expert Merriam Greene met in person for a second administrative hearing. (*Id.* at 55). Orthopedic surgeon and medical expert Dr. Donald Goldman joined by telephone. (*Id.* at 58).

Rodriguez summarized his impairments to ALJ Grossman, and testified that he had been using a walker for three months, and before that, a cane. (*Id.* at 60-63). Vega stated that there was no evidence in the record showing Rodriguez required a cane, but that an MRI and several

straight leg tests in the record supported Rodriguez's claim that his pain was severe enough to require him to use a walker. (*Id.* at 80).

In response to queries from ALJ Grossman, Dr. Goldman asked Rodriguez about several items in the medical record. (*Id.* at 82). For example, he wanted to know whether there was any record of surgical consultations regarding Rodriguez's upcoming knee surgery. (*Id.* at 89). Vega replied that there were no surgical consultations in the record, but that Rodriguez had had one a week prior to the hearing. (*Id.*). ALJ Grossman responded that he was "a little frustrated" that Rodriguez and Vega had not submitted all relevant evidence before the hearing. (*Id.* at 90).

Dr. Goldman questioned Rodriguez about his disc herniation. He noted that while an MRI showed disc herniation, he did not see evidence confirming lower back pain that this herniation could have caused. Dr. Goldman asked if Rodriguez had an electromyography test done to assess his pain. (*Id.* at 92). Vega indicated that he had no record of that test. (*Id.*). Dr. Goldman also noted that he could not interpret with confidence the straight leg tests and other measurements of range of motion in Rodriguez's lower back which appeared in the record. (*Id.* at 93-95). For example, the record did not document the actual decrease in range of motion in degrees. Dr. Goldman therefore could not determine whether Rodriguez's loss of range impaired any functions. (*Id.* at 95-96).

Dr. Goldman also questioned Rodriguez about his need for a walker or cane. Rodriguez testified that he needed to use a walker because of pain in his back and legs. (*Id.* at 96-97). Dr. Goldman later opined that Rodriguez's testimony about requiring a cane to walk was inconsistent with his testimony that he sometimes walks several blocks to visit friends. (*Id.* at 114). The ALJ appeared to concur with Dr. Goldman's observation, and noted that his grandmother could walk long distances with her walker. (*Id.* at 114-15).

Dr. Goldman testified to ALJ Grossman that the record contained "too many inconsistencies" to conclude that Rodriguez had a disability. (*Id.* at 117). He noted that there was little information "other than a lot of subjective complaints" about Rodriguez's knee impairments. (*Id.* at 100). He did not find any specific evidence to support a treating physician's conclusion that Rodriguez would have trouble fingering. (*Id.* at 111). And he did not find enough specific evidence to corroborate a treating physician's conclusion that Rodriguez could not sit or bend for periods of time. (*Id.* at 104-105). When Vega asked Dr. Goldman whether he was claiming the treating physicians were inaccurate in their assessments, Dr. Goldman replied that he was merely questioning how the physicians arrived at their conclusions. (*Id.* at 105). Dr. Goldman noted that, although the treating physician's evaluation and consultative examinations were consistent in diagnosis, the record did not provide the basis of that diagnosis and so Goldman could not assess its integrity. (*Id.* at 104-109).

ALJ Grossman concluded the hearing stating that he would have to determine if Rodriguez could perform sedentary work, or if a combination of physical and psychological impairments would prevent him from doing so. He asked Vega to provide a list of all the medications Rodriguez was taking. (*Id.* at 134).

3.      **May 13, 2013 Hearing**

ALJ Grossman, Rodriguez, Aaron Vega, and vocational expert Jakob Tikes met for a final hearing on May 13, 2013. Medical expert Dr. Malcolm Brahms joined by telephone. (*Id.* at 29). The ALJ opened the hearing by remarking that Rodriguez appeared to be in significant pain. (*Id.* at 30-31). Rodriguez testified that he had had surgery to his right leg two days earlier, (*Id.* at 31), in preparation for another surgery scheduled for June 15, 2013. (*Id.* at 37).

Despite Rodriguez's apparent distress, he and Vega wanted to proceed with the hearing. Vega noted that this hearing was being held more than a year after the last, and that the ALJ had not provided them with a reason for the delay. (*Id.* at 31-33). The ALJ replied that the record, including a written interrogatory to Dr. Goldman after the last hearing, were inconsistent and did not allow him to make a conclusion. (*Id.* at 32). Vega informed the ALJ that he and his client found the delay unreasonable and they would not be returning for any subsequent hearings. (*Id.*). ALJ Grossman said that he could understand the frustration with the delay, and hoped to resolve the case in a timely manner. (*Id.* at 33).

ALJ Grossman then questioned the medical expert, Dr. Malcolm Brahms, as to whether Rodriguez met a listed impairment according to the medical evidence in the record. Dr. Brahms testified that he did not. (*Id.* at 40). Dr. Brahms found no evidence of any injuries to Rodriguez's wrist or shoulder. (*Id.* at 41). He found no evidence of a compromised nerve root in Rodriguez's back (*Id.* at 44). And he found no evidence that Rodriguez had a joint dysfunction in his knee. (*Id.*).

Vega noted that the medical expert from the previous hearing, Dr. Goldman, *had* found that Rodriguez met the criteria for the listed impairments that Dr. Brahms rejected. (*Id.* at 45). Vega began to question Dr. Brahms, but stopped when he realized he was relying on a number of exhibits placed in the record a week prior, but which had not been sent to Brahms. (*Id.* at 47). ALJ Grossman responded that he would send Dr. Brahms the recent exhibits and a written interrogatory. (*Id.* at 50). This concluded the third hearing.

**D.    ALJ's Analysis and Decision**

ALJ Grossman denied Rodriguez's application for Disability Insurance Benefits ("DIB") and SSI on August 8, 2013. (*Id.* at 12). He followed the required five-step sequential analysis to

make a determination about Rodriguez's disability.  20 C.F.R. § 416.920(a)(4). First, ALJ

Grossman determined that Rodriguez met the insured status requirements of the Social Security

Act and had not been engaged in substantial gainful activity since February 1, 2009, the alleged

onset of disability. (Tr. at 14). Second, he found that Rodriguez suffered from several severe

impairments: right knee derangement, left shoulder derangement, disc herniation of the lumbar

spine, and bipolar disorder. (*Id.*). Third, although Rodriguez suffered from several severe

impairments, ALJ Grossman determined that they did not meet or equal the severity of any

impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and Rodriguez was therefore

not presumptively disabled. (*Id.* at 15-16). Fourth, ALJ Grossman determined that Rodriguez

could perform the full range of sedentary work, as defined in 20 C.F.R. §§ 404.1567(a),

416.967(a), despite his impairments. (*Id.* at 16-19). Finally, ALJ Grossman concluded that

Medical-Vocational Rule 201.28 directed a finding of "non-disabled" given Rodriguez's age,

education, work experience, and a residual functional capacity to perform the full range of

sedentary work. (*Id.* at 21).

> 1. **ALJ Grossman's Analysis of the Medical Evidence**
>
>> a. **ALJ Grossman Relied Primarily on Non-treating Expert Opinions to Determine That Rodriguez Did Not Meet or Equal a Listed Impairment**

In determining that Rodriguez's physical impairments did not meet or equal a listed

impairment, ALJ Grossman appears to have only considered the written opinions of two non-

examining medical experts, Drs. Malcolm Brahms and Donald Goldman. (*Id.* at 15).  ALJ

Grossman adopted Dr. Brahms's opinion that Rodriguez's impairments did not meet or equal a

listed impairment, (*Id.*), which Dr. Brahms provided in a written interrogatory (*see id.* at 1052).

ALJ Grossman, however, dismissed the contrary opinion of the other medical expert consulted,

Dr. Goldman. (*Id.* at 15).  ALJ Grossman found that although Dr. Goldman concluded that

Rodriguez's impairments could be severe enough to render him presumptively disabled, he also concluded that Rodriguez could perform some sedentary work.[4] The ALJ reasoned that Dr. Goldman's opinion was "equivocal" and therefore due little weight. (*Id.*).

ALJ Grossman next determined that the medical evidence did not show that Rodriguez suffered from bipolar disorder to the degree required in listing 12.04 in 20 C.F.R. Part 404, Subpart P, Appendix 1 (2015). Listing 12.04 is divided into three subsections, and is met when there is medical evidence that a claimant meets the elements of 12.04(A) and 12.04(B), or the elements of 12.04(C). 12.04(A) lists the medical criteria which define depressive and bipolar disorders. 12.04(B) requires "marked limitation of two" of several enumerated mental functions. And 12.04(C) requires medical documentation of some chronic affective disorder of at least two years' duration that has caused more than minimal limitations in a claimant's ability to do basic work activities, plus evidence of either (1) repeated, extended episodes of decomposition, (2) a residual disease process that would cause even a minimal increase in mental demands or environment change to trigger decomposition, or (3) inabiltiy to function outside of a highly supportive living arrangement for at least a year.

ALJ Grossman concluded, without citing any evidence in the record, that Rodriguez does not have a sufficient number of symptoms to meet the medical definition of either depressive disorder or bipolar disorder as listed in 12.04(A). (Tr. at 15). He then concluded that there was no evidence in the record that Rodriguez suffers from marked limitations in the activities of daily living, social functioning, or maintaining concentration as required by 12.04(B). (*Id.* at 16).

---

[4] Dr. Goldman had other findings which could be better reconciled. For example, he found that Rodriguez could only stand and walk for a combined total of one hour at most. On the other hand, Dr. Goldman noted that Rodriguez could sit continuously for up to four hours, continuously handle, finger, and feel with his right hand, and could continuously lift and carry up to 20 pounds. (Tr. at 778-80).

Further, ALJ Grossman found that there was "no indication in the medical record" that Rodriguez's mental impairment is serious or persistent, as defined in 12.04(C). (*Id.*).

    **b.**    **ALJ Grossman Adopted the Opinion of Two Consultative Experts and Weighed Some Medical Evidence to Determine Rodriguez's Residual Functional Capacity**

Finding that Rodriguez was not presumptively disabled, ALJ Grossman next determined that Rodriguez could perform the full range of sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), despite his impairments. ALJ Grossman evaluated the opinions of six physicians, two treating and four consultative; and two medical experts. He also analyzed the lengthy medical record to determine an overall pattern of non-disabling impairments. (Tr. at 17-19).

    **(1)**    **Weighing Physician Opinions**

ALJ Grossman adopted the opinions of two consultative medical experts who reviewed the medical record, but did not perform any examination or render any treatment to Rodriguez. According to ALJ Grossman, Drs. Brahms and Goldman both concluded that Rodriguez was not disabled. (*Id.* at 17). ALJ Grossman also accorded significant weight to the assessments of three consultative physicians, Drs. Joshi, Meadow, and Aspinal. These three physicians also found that Rodriguez's impairments were not disabling. (*Id.* at 18-19). ALJ Grossman accorded little weight to the opinions of the only two treating physicians in the record, Drs. Sotelo-Garza and Fruitman. (*Id.*). Both treating physicians found that Rodriguez's impairments were disabling. ALJ Grossman, however, discounted the opinions of the treating physicians because they were inconsistent with those of the consultative physicians, and because he found the treating physician opinions either unsupported or contradicted by treatment notes. (*Id.*). ALJ Grossman also assigned little weight to the opinion of Dr. Corvalan, a consultative physician who found

Rodriguez's functioning significantly limited by his impairments, because of internal inconsistencies in his examination notes. (*Id.* at 19). The following table summarizes ALJ Grossman's assessment of the various physician opinions:

| Physician | Relationship to Claimant | Weight | Diagnosis |
|---|---|---|---|
| Malcolm Brahms | Medical expert | Opinion adopted | Impairments not disabling |
| Donald Goldman | Medical expert | Opinion adopted | Impairments not disabling |
| Dipti Joshi | Consultative | Significant | Impairments not disabling |
| Danilo Sotelo-Garza | Treating | Little | Functioning is limited by impairments |
| Jose Corvalan | Consultative | Little | Functioning is limited by impairments |
| Herb Meadow | Consultative | Significant | Functioning not limited by bipolar disorder |
| Sheila Aspinal | Consultative | Significant | Functioning somewhat compromised but not significantly limited |
| Edward Fruitman | Treating | Little | Markedly limited by bipolar disorder |

#### (2)   Analyzing the Medical Evidence in the Record

ALJ Grossman also evaluated the medical evidence presented in the record. He discerned an "overall pattern" that Rodriguez's orthopedic impairments were not disabling. (*Id.* at 18). ALJ Grossman cited to examinations from January 20, 2011, August 25, 2011, October 19, 2011, and September 14, 2012, that show Rodriguez "consistently exhibited intact sensation and motor function." ALJ Grossman did not cite particular exhibits or pages in the record, but appears to be referring to follow-up orthopedic evaluations by Dr. Sotelo-Garza (whose final opinion he accorded little weight), (Tr. at 694, 895), by Dr. McCulloch, (*Id.* at 698), and by Dr. Dubey, (*Id.* at 888). ALJ Grossman also refers to an August 16, 2012 examination which found

no joint swelling or gait disturbance, and a July 5, 2012 examination which found Rodriguez's chronic back pain fairly controlled by pain medication. The August 16, 2012 visit appears to be an office visit to All Med Clinic which Rodriguez scheduled to fill out paperwork. (*Id.* at 922). The July 5, 2012 examination appears to be another office visit, this one to refill medication. (*Id.* at 930). ALJ Grossman does not provide other specific examples, aside from these six examinations, of the overall pattern of impairment, but not disabilty, which he discerns in the nearly 700 pages of medical evidence.

## III.   DISCUSSION

### A.   Standard of Review

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§

423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**B.     Determination of Disability**

### 1.     Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A

claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49.

The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 584-87 (S.D.N.Y. 2012) (reviewing an ALJ's credibility determination). In determining whether there is any other work the claimant can perform, the Commissioner has the burden of

showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler,* 3 F.3d at 567-69. The Commissioner may

rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(c).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty

to seek out more information from the treating physician and to develop the administrative record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*, 168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

## C.    The Parties' Claims

Rodriguez asks that the Commissioner's decision to deny him SSI and DIB benefits be reversed and remanded solely for calculation of benefits. Alternatively, he asks that the Court vacate the ALJ's decision and remand to another ALJ with a time-limit imposed on the remand proceedings. Pl.'s Mem. in Support of His Mot. for J. on the Pleadings, 1. Rodriguez claims that the ALJ erred in failing to appreciate that Rodriguez could not ambulate without a walker or cane. According to Rodriguez, the regulations require a finding of disability if the claimant needs an assistive device to ambulate. He argues that the evidence therefore supports a judgment that he is disabled under the Social Security Act, and should have his case remanded for a calculation of benefits only. *Id.* at 19-20. Rodriguez also claims that the ALJ failed to appropriately weigh his manipulative limitations in determining his RFC. *Id.* at 21-22. He also challenges ALJ Grossman's ability to be fair, and claims that remanding his case for further proceedings before Grossman would be "punitive." *Id.* at 24. He bases this claim on two assertions. First, Rodriguez maintains that ALJ Grossman is responsible for the delay in

concluding the administrative hearings (they commenced on December 2011 and the ALJ

handed down his decision in August 2013). Second, he asserts that ALJ Grossman improperly

dismissed the importance of Rodriguez's need for a walker or cane. Pl.'s Reply Mem., 5; Pl.'s

Mem. in Support of His Mot. for J. on the Pleadings, 20.

      The Commissioner argues that the case should be remanded, but argues that remand only

for calculation of benefits is not supported by the record.  The Commissioner concedes that ALJ

Grossman erred by not considering Rodriguez's manipulative limitations in his RFC analysis.

Mem. of Law in Support of the Commissioner's Cross-Motion for Remand and in Opp'n to Pl.'s

Mot. for J. on the Pleadings, 4.  The Commissioner also concedes that remand is warranted here

because ALJ Grossman relied on medical evidence from two physicians who have been indicted

for healthcare fraud. *Id.* at 8-11.  The Commissioner maintains, however, that ALJ Grossman

was not responsible for any delays in Rodriguez's hearings and that there is no evidence in the

record to counter the presumption of ALJ Grossman's honesty and integrity. *Id.* at 12-13.  She

concludes that there is therefore no need to remand to a different ALJ or to impose a time limit

for a decision on remand.

**D.    ALJ Grossman Relied on Testimony from a Physician who has since Pled Guilty to Healthcare Fraud**

      In arriving at his conclusion that Rodriguez's mental impairments did not rise to the level

of disability, ALJ Grossman gave significant weight to the evaluations of Dr. Herbert Meadow.

(Tr. at 19).  Dr. Meadow pled guilty to healthcare fraud and attempted enterprise corruption in

Kings County Supreme Court on November 5, 2015.  The indictment alleged that Dr. Meadow

had participated in a conspiracy to defraud Medicaid and Medicare by recruiting insured

individuals and ordering medically unnecessary procedures.  Ex. A, Def.'s Mem. of Law in

Support of the Commissioner's Cross Motion for Remand and in Opp'n to Pl.'s Mot. for J. on

the Pleadings at 4. Dr. Meadow allegedly upcoded billings to inflate fees, and also referred Medicaid-insured patients to other physicians within the alleged enterprise. *Id.* at 11-12. This conspiracy allegedly existed from about October 1, 2012, to about September 30, 2014. *Id.* at 1.

Although Dr. Meadow's evaluation of Rodriguez occurred on February 2, 2012, eight months before the estimated start of Dr. Meadow's fraudulent conduct, the Commissioner argues that ALJ Grossman's reliance on that evaluation is a sufficient basis for remand. *Id.* at 8-11. 20 C.F.R. §§ 404.1503(b) and 416.903(b) state that the Commissioner will not consider evidence from a medical source convicted of healthcare fraud unless the Commissioner finds good cause to do so. Good cause may be found, for example, when the evidence in question is from a period before the provider was convicted of fraud, 20 C.F.R. §§ 404.1503b(b)(2), 416.903b(b)(2). Since fraud is grounds for reopening a DIB or SSI claim at any time, 20 C.F.R. §§ 404.988(c)(1), 416.1488(c), it is reasonable to remand at this point for reconsideration in light of Dr. Meadow's conviction. *See Ferone v. Colvin*, No. 14-CV-5140 (CM) (HBP), slip op. at 3 (S.D.N.Y. Sept. 16, 2015) (remanding case in light of Dr. Meadow's indictment even though medical opinion was prior to the alleged fraud).

**E.     ALJ Grossman's Determination that Rodriguez's Impairments Did Not Meet or Equal the Severity of a Listed Impairment is Not Supported by Substantial Evidence**

In finding that Rodriguez's impairments did not meet or equal the severity of a listed impairment, ALJ Grossman adopted the opinion of a single, non-treating medical expert, Dr. Malcolm Brahms. (Tr. at 15). He did not provide any specific reasons for doing so or any discussion of how he weighed Dr. Brahms's opinion against other evidence in the record. Although he recited the conclusions of the doctor's opinion, ALJ Grossman did not cite any medical evidence to corroborate those conclusions or otherwise support his own decision. ALJ Grossman's determination about the severity of Rodriguez's impairments thus appears

conclusory, and does not contain specific reasons or factors that would enable a reviewing court to determine if his decision was supported by substantial evidence. (*Id.* at 15-16). "[T]he propriety of agency action must be evaluated on the basis of stated reasons," *Ferraris*, 728 F.2d at 587 (quoting *Treadwell v. Schweiker*, 698 F.2d 137 (2d Cir. 1983)). The decision here does not state any specific reasons from the medical record to justify the conclusions drawn.

ALJ Grossman does, however, discuss his reasons for disregarding the conclusions of the second non-treating medical expert, Dr. Donald Goldman. (Tr. at 15). Dr. Goldman concluded that Rodriguez's impairments *could* equal the severity of a listed impairment, but the record was not adequately developed to allow him to firmly conclude that they did. (*See id.* at 117, 786). ALJ Grossman chose not to pursue Dr. Goldman's conclusion that Rodriguez could meet or equal the severity of a listed impairment because he found the conclusion inconsistent with Dr. Goldman's other conclusion that Rodriguez could perform sedentary work. (*Id.* at 15). This was not an appropriate response. When there is a conflict or ambiguity in a medical source statement, the ALJ must "seek additional evidence or clarification from the medical source." *Calzada*, 753 F. Supp. 2d at 274. Dr. Goldman's express statement to the ALJ that the record was insufficient for him to determine if Rodriguez's impairments met or equaled a listed impairment should have been a clear signal to develop the record further. *Id.* at 269. Specifically, Dr. Goldman's written interrogatory lists several pieces of missing information that, if provided, would allow him to decide whether Rodriguez's impairments were severe enough to render him presumptively disabled. (Tr. at 786).

Additionally, ALJ Grossman's exclusive reliance on Dr. Brahms's and Dr. Goldman's opinions about Rodriguez's capacity for sedentary work, rather than on any medical assessment about the symptoms and nature of his impairments falls short of the substantial evidence

standard. *See, e.g.*, *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) ("[A]n ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence"); *Conlin ex rel. N.T.C.B. v. Colvin*, 111 F. Supp. 3d 376, 387 (W.D.N.Y. 2015) (finding that medical source opinions are supported by substantial evidence "where such opinions are supported by substantially similar findings in treatment notes and other opinions in the record"). SSR 96-5p instructs that whether a claimant's impairments meet the requirements of a listed impairment "is usually more a question of medical fact than a question of medical opinion."

To meet the substantial evidence standard, the ALJ's determination should point to specific elements of the record, such as consultative physician's reports, that weigh evidence of loss of motion, musculoskeletal degeneration, and arthrograms, *Williams v. Bowen*, 660 F. Supp. 192, 196 (S.D.N.Y. 1987), or medical source opinions which cite substantial and specific medical evidence, *Puente v. Comm'r of Soc. Sec.*, 130 F. Supp. 3d 881, 887-89 (S.D.N.Y. 2015) (citing x-rays, knee and lumbar range-of-motion tests, MRIs, multiple consultations with consistent opinions, and a specific opinion that claimant's cane was not medically necessary as evidence to support the AJ's decision). Without a comparable basis in the medical documentation of Rodriguez's impairments, the Court cannot conclude that ALJ Grossman's determination is supported by substantial evidence.

**F.    ALJ Grossman's Residual Functional Capacity Determination is Not Supported by Substantial Evidence**

ALJ Grossman's assessment of Rodriguez's residual functional capacity found Rodriguez capable of "the full range of unskilled sedentary work." (Tr. at 16). In making this determination, ALJ Grossman accorded significant weight to the conclusions of three consultative physicians who found Rodriguez's impairments not disabling. One of these

physicians was Dr. Herbert Meadow, whose opinion should be re-evaluated in light of his conviction for healthcare fraud. *See supra*, Section D. ALJ Grossman accorded little weight to the conclusions of both of Rodriguez's treating physicians, who found Rodriguez's impairments disabling.  To support his decision to give significant weight to the conclusions of two consultative physicians and give little weight to the conclusions of two treating physicians, ALJ Grossman cited six documents in the record as evidence of "an overall pattern" in the record that Rodriguez "has been able to perform the exertional demands of sedentary work at all times relevant to this decision." (*Id.* at 18).

The ALJ's decision fails on multiple counts.  First, he did not adequately explain, with either reasoning or evidence, his preference for the conclusions of consultative physicians over the conclusions of Rodriguez's treating physicians as required by the treating physician rule.  Dr. Danilo Sotelo-Garza, an orthopedic surgeon at All-Med Clinic, treated Rodriguez several times in 2011 for lower back pain and disc herniation. (*Id.* at 895-99).  In November 2011, Dr. Sotelo-Garza filled out a "multiple impairments questionnaire," concluding that Rodriguez was significantly limited to sit, stand, or walk for extended periods of time, and could only "occasionally" lift or carry objects up to 10 pounds. (*Id.* at 674).  ALJ Grossman found these conclusions "unsupported by treatment notes" and so gave them little weight. (*Id.* at 19).  While it is true that the multiple impairment questionnaire (a standardized form of checkboxes and short-answer questions) does not contain any treatment notes, Dr. Sotelo-Garza's treatment notes from just a month earlier do describe disc herniation, specific decreases in Rodriguez's range-of-motion (with degrees provided), and note that he referred Rodriguez to a neurologist to rule out nerve-damage which could be the cause of his lower back pain. (*Id.* at 895-96).

The Commissioner will "always provide good reasons" for the weight she assigns to a claimant's treating source opinion. 20 C.F.R. § 404.1527(c)(2); *Schaal v. Apfel*, 134 F.3d 496, 503-504 (2d Cir. 1998). While the Commissioner has the right to disagree with a treating source's opinion, she must explain her decision to disagree. Referring to a treating source's opinion as inconsistent or contradicted by other evidence in the record does not suffice as a "good reason" without more. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). Neither the claimant nor a reviewing court can tell whether the ALJ's conclusions with respect to the treating physician are acceptable when the ALJ fails to provide good reasons for her decision. *Id.* ("It may be that there are reasons for discrediting the report…[b]ut it is equally possible that the failure to give weight to those findings was inadvertent."); *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("[The good reason] requirement greatly assists our review of the Commissioner's decision and let[s] claimants understand the disposition of their cases.") (quoting *Snell*) (internal quotation marks omitted); *Burgin v. Astrue*, 348 Fed. App'x 646, 649 (2d Cir. 2009) ("The ALJ's consideration must be explicit in the record.").

Moreover, ALJ Grossman should have made a more detailed inquiry into Dr. Sotelo-Garza's treatment notes. When there are inconsistencies in a treating physician's notes, or when they are perceived as "sparse" or "inadequate," "the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Rosa*, 168 F.3d at 79 (quoting *Hartnet*, 21 F. Supp. at 221) (internal quotation marks omitted). But even beyond this, evidence from the administrative hearings show that Dr. Sotelo-Garza's treatment notes should have been of particular interest to ALJ Grossman. At the April 23, 2013 hearing, Dr. Goldman testified that he could not corroborate many of the treating physicians' conclusions about Rodriguez's limitations because the supporting treatment notes

were not specific enough. (Tr. at 94-104). For example, he said he could not opine on Rodriguez's back impairment because, although there were multiple notes with the results of a straight leg test, they did not show the decreased range of motion in degrees or provide a baseline for comparison. (*Id.* at 95). Dr. Sotelo-Garza's treatment notes, submitted into evidence after the hearing with Dr. Goldman, provide both measurements and a baseline in degrees from a straight leg test performed on Rodriguez. (*Id.* at 895). Thus, the deficiency in the evidence that Dr. Goldman identified was subsequently provided by Rodriguez, and yet does not appear to have received any attention from ALJ Grossman. In light of an ALJ's duty to examine any inconsistencies in the record *sua sponte*, failure to consider an inconsistency identified in an administrative hearing, and later addressed by evidence provided by the claimant, merits remand. *Schaal*, 134 F.3d at 505 (remand warranted by ALJ's failure to develop record after identifying inadequacies and Appeals Council's failure to consider evidence submitted by claimant which would have addressed those inadequacies).

Secondly, ALJ Grossman did not cite substantial medical evidence in the record to support his conclusion that Rodriguez can perform sedentary work. The six documents he cited, in a medical record nearly 700 pages long, pertain to minor follow-up appointments in which no primary diagnoses were made. One document relied on by ALJ Grossman is from a Rodriquez visit with Dr. Sotelo-Garza, a treating physician whose findings he accorded little weight overall. (Tr. at 19). ALJ Grossman does not explain how he decided to discount Dr. Sotelo-Garza's assessments generally, but rely on this one in particular. Another document cited by ALJ Grossman is a routine examination performed during an office visit Rodriguez made to fill out paperwork on August 16, 2012. (*Id.* at 922). A third document relied on by ALJ Grossman is from a Rodriquez office visit to have his medication refilled on July 5, 2012. (*Id.* at 930). These

last two documents do not contain detailed information about Rodriguez's orthopedic or psychiatric impairments, and do not appear to be related to visits whose purpose was diagnostic.

ALJ Grossman cites a line from the August 16, 2012 report that Rodriguez was "negative for joint swelling and muscle weakness." No specifics are provided. Further, that note does not appear in the "physical examination" portion of the report, but rather in the "review of systems" section, which contains information that is more likely self-reported than directly observed (for instance, "negative for constipation" and "negative for cold intolerance and heat intolerance" also appear in this section). (*Id.* at 923). This short and ambiguous line is insufficient to establish "an overall pattern of evidence" that Rodriguez's impairments were not disabling. (*Id.* at 18); *McClain v. Barnhart*, 299 F. Supp. 2d 309, 326-27 (S.D.N.Y. 2004) (exclusive focus on "positive snippets" of a record that otherwise contains a "significant quantity" of evidence suggesting disability does not meet the substantial evidence standard); *Ferraris*, 728 F.2d at 587 ("[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence."). ALJ Grossman also refers to a note from the July 5, 2012 examination, made during a visit to refill medication, that Rodriguez's gait was "normal," (*Tr.* At 18.), but fails to include that Rodriguez's spine was tender and that he had muscle spasms in his back. (*Id.* at 932).

Beyond their ambiguity, it is unclear why these two visits, apparently made to carry out a course of treatment, rather than for primary diagnosis and determination of what that course of treatment should be, are given special diagnostic weight. Numerous other documents in the record make detailed diagnoses of Rodriguez's impairments – including readings of MRIs, (*Id.* at 946), lists of medication, (*Id.* at 700), a prescription for a cane, (*Id.* at 643), and flexion and extension tests, (*Id.* at 759) – but are not discussed in ALJ Grossman's decision. It is true that

the August 16 and July 5, 2012 reports indicate that Rodriguez's condition did not appear obviously severe to the doctor and nurse practitioner who examined him. It's not clear, however, how this evidence stacks up against other evidence such as orthopedic evaluations finding limited range of motion and pain, (*Id.* at 897), or examinations finding swelling, tenderness, and degenerative change in the right knee (*Id.* at 888), or six pages of prescriptions for pain medication (*Id.* at 770-76).

Of course, an ALJ need not proceed through the record and "mention[] every item" in order to adequately explain her decision. *Mongeur*, 722 F.2d at 1040. But she also cannot overlook or ignore evidence in the record. *Ruiz*, 2002 WL 826812, at *7 ("Although there is some evidence to support the conclusion that the plaintiff was not disabled, it is difficult to evaluate whether this evidence is "substantial" in the absence of a discussion of the evidence as a whole."). Citing only six documents, some of which are of uncertain diagnostic value, in a record of medical evidence almost 700 pages long, is an oversight on a scale which compels the Court to conclude that ALJ Grossman's decision is not supported by substantial evidence.

**G.     Remand for Calculation of Benefits is Only Inappropriate Given the Need to Develop the Record**

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Secretary for further development of the evidence." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). When, however, the record is sufficiently developed for the court to conclude that more evidence would not affect the Commissioner's decision, remand for a calculation of benefits is appropriate. *Rosa*, 168 F.3d at 83. In this case, ALJ Grossman's failure to further develop the inconsistencies he identified in the evidence provided by Rodriguez's treating physicians warrants remand for further proceedings. *See id.* (finding the ALJ's failure to obtain evidence from claimant's

treating physicians as to the extent of her injuries made remand for further proceedings a "wiser course" than remand for calculation of benefits); *see also Butts v. Barnhart*, 388 F.3d 377, 385-87 (2d Cir. 2004) (comparing circumstances in which remand for further proceedings or remand for calculation of benefits only is appropriate); *Williams v. Apfel*, 204 F.3d 48, 50 (citing cases in which the record was developed enough to warrant remand with calculation for benefits). Additionally, the fact that ALJ Grossman relied on evidence from a physician subsequently convicted of healthcare fraud supports remand with further administrative proceedings. ALJ Grossman may reconsider the evidence of Rodriguez's psychic impairments without Dr. Meadow's assessment, and because the record will contain less evidence without Dr. Meadows' assessment, the opportunity to gather additional evidence should be afforded.

**H.    Remand to ALJ Grossman for Further Administrative Proceedings Without a Time Limit**

**1.    The Fundamental Fairness of Proceedings Before ALJ Grossman**

Rodriguez has asked that, if remanded, his case be assigned to a different ALJ. ALJ Grossman, he argues, is unable to fairly adjudicate the claim. As evidence of the ALJ's bias, Rodriguez claims that ALJ Grossman has unreasonably delayed the proceedings, and that ALJ Grossman willfully ignored evidence of his ambulatory impairment. Pl.'s Mem. in Support of his Mot. for J. on the Pleadings at 23.

The decision to remand to a different ALJ is generally understood as one for the Commissioner to make, although it is within the power of the reviewing court to make such an order when the ALJ's conduct "gives rise to serious concerns about the fundamental fairness of the disability review process." *Ocasio v. Astrue*, No. 08-CV-2016, 2009 WL 2905448, at *5 (S.D.N.Y. Sept. 4, 2009) (quoting *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004)). Factors to consider when determining whether the ALJ's conduct has compromised the

integrity and fairness of the hearing include: "(1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." *Sutherland*, 322 F. Supp. 2d at 292. Courts within this Circuit have remanded to a different ALJ when there was clear indication that the ALJ would not apply the correct legal standards, *Sutherland*, 322 F. Supp. 2d at 292, when an ALJ had committed clear legal errors *and* displayed hostility towards claimant's counsel, *Lebron v. Colvin*, No. 13-CV-9140 (WHP) (DF), 2015 WL 1223868, at *24 (S.D.N.Y. Mar. 16, 2015), and when the ALJ appeared more concerned with vindicating his prior rulings that in obtaining the correct result, *Dillingham v. Astrue*, No. 09-CV-236 (GLS) (VEB), 2010 WL 3909630, at *17 (N.D.N.Y. Aug. 24, 2010).

A common element in the cases where courts have ordered a different ALJ is the existence of hostility or other evidence of a biased attitude on the part of the ALJ, typically demonstrated through comments the ALJ made during hearings, or by his deliberate refusal to properly consider evidence. Rodriquez maintains that the standard is met in this case. He claims, for example, that ALJ Grossman "deliberately and inexplicably" rejected evidence that Rodriguez required a cane or walker. Pl.'s Mem. in Support of his Mot. for J. on the Pleadings, 23. The unexplained rejection of relevant medical evidence, however, without additional evidence of partiality, incompetence, or bias, constitutes a legal error, not a legal error induced by hostility. Unexplained decisions do not justify remand to a different ALJ. *Lebron*, 2015 WL 1223868 at *24 ("Legal error alone is insufficient to support a finding of bias."). Rodriguez points to a moment in the April 23, 2012 administrative hearing when ALJ Grossman expressed

skepticism that relying on a walker means one is necessarily limited in how far and fast she can walk. (Tr. at 114-16). ALJ Grossman stated that his elderly mother walked over a mile with her walker recently. (*Id.* at 115). The Court cannot conclude that this isolated comment indicates a hostile attitude towards Rodriguez, especially in light of ALJ Grossman's concern for Rodriguez's pain during the May 13, 2013 hearing, (*Id.* at 30-31) (ALJ: "You're in obvious distress right now. Can you go on with this hearing?" CLMT: "Yes." ALJ: "You sure?…I mean, I – counsel, you could have delayed this if it was necessary."), his verbal commitments to processing the evidence as quickly as he can, (*Id.* at 48-52), and his willingness to accommodate supplemental hearings at the request of Rodriguez's attorney, (*Id.* at 178).

Similarly, the extended delay in processing Rodriguez's claim does not necessarily indicate a fundamental unfairness on the part of ALJ Grossman. It took the Commissioner four years and nine months to deny Rodriguez's application for benefits. For about one year and nine months Rodriguez was in hearings with ALJ Grossman, which certainly exceeds the Bronx hearing office's average processing times in 2012 and 2013, but is less than one-half of the total time Rodriguez waited for his claim to be denied.[5] The remaining three years were spent waiting for the rest of the process to run – it took about six months for Rodriguez's initial application to be denied, ten months for a hearing to be assigned, and a year-and-a-half for the Appeals Council to deny Rodriguez's appeal. Moreover, the above-average length of Rodriguez's administrative hearing process may have been due, at least in part, to decisions made by Rodriguez's counsel. After the initial hearing, when ALJ Grossman decided to send Rodriguez for orthopedic and

---

[5] The average processing time for FY 2012 was 332 days, and 363 days for FY 2013. *See* Social Security Administration, *Archived Public Data Files*, http://www.ssa.gov/appeals/DataSets/archive/archive_data_reports.html (last visited Oct. 21, 2016). One thousand seven hundred thirty-two days passed between Rodriguez initially filing a claim for benefits on June 11, 2010, and the Appeals Council handing down its final denial, on March 9, 2015. ALJ Grossman spent 602 of those days making the determination under review here. Thus, ALJ Grossman's hearings took up about 34% of the total time the Commissioner used to process this claim.

psychiatric evaluations, Rodriguez's attorney requested a supplemental hearing should ALJ Grossman consult with a medical advisor. (Tr. at 176-78). At that subsequent hearing, Rodriguez's attorney indicated to ALJ Grossman that there was additional documentary evidence of Rodriguez's need for a walker, and records from a recent orthopedic evaluation, neither of which had been presented to the ALJ. (*Id.* at 79-80, 89). The haphazard state of the evidentiary record continued into the final hearing, in which Rodriguez's attorney started to question the medical expert about evidence that was only submitted to ALJ Grossman days before, and not transmitted to the expert for his review. (*Id.* at 47-50). Thus, insofar as the three administrtive hearings were incomplete or inefficient, this was not due solely to the actions of ALJ Grossman, but partially due to those of Rodriguez's attorneys. Consequently, the delay in the ALJ's decision does not clearly indicate bias.

2. **Remand with a Time Limit is Only Appropriate When a Claimant Has Proven Disability in the First Four Steps of Analysis**

Rodriguez asks that the Court impose a time limit on any remanded proceedings. The Second Circuit has authorized such an remedy only in cases in which a claimant has proven her disability through the first four steps of the five-step sequential disability analysis, and the burden of proof has shifted to the Commissioner. *Butts v. Barnhart*, 416 F.3d 101, 103 (2015); *see also Uffre v. Astrue*, No. 06-CV-7755 (GWG), 2008 WL 1792436, at *8 (S.D.N.Y. Apr. 18, 2008) ("The Court is unaware of any case that has set a time limit where the claimant had not yet been determined to be disabled."). Because I remand for further proceedings to determine whether Rodriguez is disabled at steps three and four of the sequential analysis, it would be improper to add a time limit. However, the Court is mindful of the amount of time Rodriguez has spent pursuing his claims for benefits. As of today, it has been more than six years since Rodriguez filed his initial claim with the SSA. The Court "'expects proceedings to be conducted

and resolved expeditiously,' as befits an agency charged with the important trust of determining entitlement to disability benefits." *Id.* (quoting *Wright v. Astrue*, No. 06-CV-6014, 2008 WL 620733, at *4 (E.D.N.Y Mar. 5, 2008)).

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Rodriguez's and the Commissioner's requests to **REMAND** for further administrative proceedings, and **DENIES** Rodriguez's requests for an instruction for calculation of benefits, assignment to a different ALJ, and imposition of a time limit in remand proceedings, pursuant to 42 U.S.C. § 405(g) and consistent with this Opinion and Order.

**SO ORDERED this 31st day of March 2017.**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**